Case number 12-02520. Mr. Haji v. Columbus City Schools, Columbus City Schools for their education. Argument number C, 15 minutes per side. Mr. Baraga is the supervising attorney for Mr. Tsuge. It will be argument for the appellate. Good morning, Your Honors. Stephen Baraga, on behalf of the Appellate Litigation Clinic at the University of Virginia School of Law, I'd like to introduce to the court this morning for your student, Jack Tsuge, who satisfies the requirements for practice before this court. And who has the consent of our client to argue this appeal this morning. And we've granted that motion. You may proceed. Good morning, Your Honors. May it please the court, my name is Jack Tsuge, counsel for the appellant, Mr. Haji. With your permission, I'd like to reserve three minutes for rebuttal. You may. In sum, there are two rulings by the district court that are at issue in this appeal, and they both suffer from the same flaw. The court's improper resolution of disputed material facts on summary judgment. The case before you today is a civil rights case, raising important claims involving free speech and religion. Mr. Haji was a Somali-born Muslim who was employed by Mifflin Middle School, part of the Columbus City School District. While employed at Mifflin, he posted a YouTube video of himself online that depicted him speaking out at his mosque on a matter concerning his religion. Shortly after discovering the video, the Mifflin administration began an investigation in which the school's investigator aggressively interviewed Mr. Haji and his wife regarding his political and religious background, and insinuated that Mr. Haji was a jihadist. Ultimately, this investigation resulted in two things. Was it improper to have any investigation at all of this speech that attacked the school board and the schools? I wouldn't say it's improper to have any investigation at all, but the character and nature of the investigation seemed to exceed what was proper. Remember, the investigation was meant solely to discover what was on the video, because it was spoken in Somali, so they didn't know what the content of the speech was. You know, the jihadist thing seems only to be backed up by the amended complaint. Am I missing some actual testimony? Mr. Haji, yes. Mr. Haji has testified that during the course of their investigation into the YouTube video, they asked him if he was a jihadist. The clear implication of that question, I think, is that they believe that he, for some reason, was a Muslim extremist, that he harbored some jihadist tendencies, I suppose. Was that from a particular deposition page? I'm not sure of the exact page, but it is in the record. It's Mr. Haji's deposition testimony. Okay. So Mr. Haji has brought two claims, the free speech retaliation claim and the Title VII religious discrimination claim. I'd like to begin by talking about why the free speech retaliation claim should not have gotten summary judgment and then explain why the same is true for the Title VII religious discrimination claim. Regarding free speech retaliation, it's clear based on the evidence in the record that Mr. Haji has established a prima facie case. The only element of a prima facie case that's in dispute here today is the third and final element, this question of causation. It's not disputed that Mr. Haji has suffered an adverse employment decision when he was fired, nor that the content of the YouTube video was protected speech under the First Amendment. So the question for this court is, is there enough evidence based on the record to show a causal relationship, at least in part, between the discovery of the YouTube video and Mr. Haji's ultimate termination? I think the answer to that question is yes for the following reasons. So the discovery was what, March of 2008 or something? The record is unclear exactly the precise date, but it's around March of 2008. That's correct. And his termination was in? June of 2008. Am I right? Your side says it was March. Their side says early 2008, or is it vice versa? They say it's ambiguous. The deposition of the principle indicated that it's sometime after January. So conceivably that's out of February or March of 2008. But I think there are a number of facts to show that there is a causal relationship. Perhaps the most obvious is that Mr. Haji has provided deposition testimony that indicates that he had an employment agreement that would allow him to go and lead prayer in his capacity as an imam on Friday afternoons. This agreement is not memorialized anywhere, right? He says somebody said it to him? Yes, that's correct. It's not memorialized. But there is some circumstantial evidence in the record, most notably the 28 months of uninterrupted ability to leave early on Friday afternoons. Let me ask you about this, because this to me may be sort of the crux of the situation. You know, if you work for a city and you're a political supporter of the mayor so you don't have to come to work when you don't want to, and then the new mayor gets elected and you were on the other side and the new mayor wants you to work the 40 hours that your contract says, if the new mayor makes you live up to your contract, presumably there is an employment contract here that says something about working regular hours. I think your hypothetical is a little bit different than the case here because Principal Lewis is the one that hired Mr. Haji. He's also the one, according to Mr. Haji, that offered him the ability to leave early on Friday. So there's no switch in supervisors. No, but the break event, you say, is now discrimination because of the discovery of the video. In my hypothetical it's purely political, but it's the same, right? It would be First Amendment if learning something politically bad about somebody, small p, political, the video, if that is the trigger point, why is it any different from my example? The difference is making you live up to your contract. I think I understand your question. I think what's important in this case is that, well, the question is whether, based on the evidence in the record, could a reasonable fact finder infer from that evidence that there's a causal relationship. And I think the 28 months of uninterrupted ability to leave early is strong evidence that suggests that he did have an employment agreement. It was only after the discovery of the YouTube video that he was no longer allowed to act on that employment agreement. Well, I mean, we also have the complaint from Ms. Ellington, correct? She complains that he's not in the classroom on Friday afternoons, right? Which I would imagine would be a fairly significant deal, right? Because she has a language barrier with many of the students, and he's not there for two or three hours on Friday afternoons. I mean, that is a real practical problem. Isn't that fair to say that is a real practical problem? I think that's true. But there is deposition testimony from Ms. Ellingwood that indicated that she would frequently remind Mr. Haji when it was time to leave early on Friday afternoons. That was before she complained? That was before the discovery of the YouTube video. It was only after the discovery of the YouTube video that she began to complain about Mr. Haji's leaving early on Friday. I mean, do we have any reason to think that she is retaliating based on a YouTube video as opposed to, again, having a practical problem about absences on Fridays that seem to be more extended than they were earlier? Well, I think it's important to note that Mr. Haji's performance evaluations were always positive. His written performance evaluations were positive. And the fact that he was leaving early for two and a half years, in fact, the entire time that he was employed at Mifflin up until the discovery of the YouTube video, lends credence to this notion that his absence was not particularly burdensome on Ms. Ellingwood. When did he become an imam at the mosque? It wasn't the whole time, correct? I believe he was an imam before he was employed at Mifflin Middle School. My understanding from the record is that he took on a larger role at the mosque relatively late in his tenure at the school, which made his absences longer than they were before. Is that a fair characterization of the record? I would disagree with you in this regard. I believe Mr. Haji requested this accommodation to leave early on Friday afternoons right about one day after he was hired. Sorry, one day after he was hired? Yes. So I would disagree with your characterization of the record in that he didn't have religious obligations that would require him to leave early. My question is specifically whether his absences were longer in duration later in his tenure at the school than they were earlier. My impression from the record is the answer to that question is yes. But if that is mistaken, I want to give you a chance to point me to some record page or something that disabuses me of that idea. Well, I think Mr. Haji has provided deposition testimony that indicated that the times he was leaving, when he would leave on Friday afternoons, varied. So it may well have been that very early on perhaps he was leaving at one o'clock as opposed to noon. I'm not really talking about departure time. I'm talking about duration. But, you know, I think if he is away for a longer period of time, then that is a significant factor with regard to causation. Okay. Well, additionally, I would like to point out one additional fact that shows causation, and I think might address part of your concern, is that Principal Lewis actually met Mr. Haji while Mr. Haji was sort of serving this role as a Somali liaison. He was representing the interests of Somali parents before the school board at a school board meeting. There was a lot of religious and racial tension going on at the time, so it was thought that Mr. Haji could sort of help facilitate better relations. So Principal Lewis knew of Mr. Haji's role in the Somali community, that he had other obligations outside of what would become his job responsibilities at the school. If I may, I would like to turn now briefly to the Title VII Religious Discrimination. Let me just ask you one other thing, which was, is it correct that the record shows that they offered to allow him to use leave time for these extra absences on Friday once they got into the fuss about it? That's correct. So it wasn't that they prevented him, but just like anybody else who took off time for one reason or another, he would have to use the appropriate type of leave time. That's correct. They did offer him, they asked him to use the three days of religious leave in addition to, I believe, his two days of personal leave. Okay, one other thing. The red brief at least says that he incorporated the mosque in 08. Was there any difference in the way he operated with the mosque before? That is, did the mosque exist? I'm looking at page four of the brief citing Haji Transcript 3 saying he incorporated the mosque in March or April. I'm not sure if there was any practical difference. I do know that he was the only imam for that mosque. So if he was not… So it existed even if it wasn't incorporated? I believe it did exist. Okay, go on to your other point. He was not able to… So if I may? Oh yeah, please. So can you hear me okay? Yes. All right, if I may, just before you move on, I understand your time is short and you want to move on to Title VII, but just a couple of things by way of clarification. So as I understand it, he was approached by someone from the school and encouraged to apply, was he not? That's correct. Principal Lewis approached him at that school board meeting I referenced. And at that time he was already an imam or functioning as an imam, is that right? I believe that's correct, yes. And in addition, wasn't it the testimony of the principal's secretary that she was aware that he was leaving on Fridays to go to prayer services during that, say, 28 months or so? Yes, that's correct. And so you pointed to that, that as evidence, is it not, that tends to support that the principal may well have known, despite his later denial, that Mr. Haji was leaving for prayer services on Friday? Yes, I think that's an accurate characterization. And I would like to remind the Court about the summary judgment standard. When there's a disputed issue of a material fact, all inferences should be made in favor of the non-moving party. You'll get those inferences, I assure you. Your Honors, I do see that I'm out of time. We know the briefs on the other issue. Thank you. You'll have your time for rebuttal. Good morning, Your Honor. May it please the Court opposing counsel. My name is Richard Ross. I represent the appellees in this matter, the Columbus City School District Board of Education, and the Director of Personnel, Duane Howard. The matter that reaches you is distilled to these two issues which counsel identified, the First Amendment issue and the Title VII issue. And, you know, while the record is convoluted in pieces, as some of you have noted, it is also true that Judge Graham, the District Court, I'm sorry, the District Court, examined the record very thoroughly, went through it very thoroughly. A substantial part of his decision details what the record is, and in every instance where there may have been some ambiguity, he interpreted the evidence most favorable to the appellant. So in terms of material disputes of fact which would defeat summary judgment, it's our position that that does not exist here. And let me address some of the issues that the Court raised earlier. On that basis in particular, we take it, take the inference that the principal and the organization did know about his leaving early. Yes. I believe the principal indicated that he was aware that Mr. Hodgey was leaving. But the arrangement was that Mr. Hodgey could use his lunchtime and he needed 60 minutes to 90 minutes to go to his mosque, pray, and come back. So the deal was, it wasn't a deal, it was more like, you know, accepting what Mr. Hodgey was doing. Because he was valuable in the classroom, he was permitted to leave and return to finish out his work. And as the Court identified, as time went on, Mr. Hodgey's activities changed. Which activities are you talking about? His leaving the school. Okay, and what do you mean by that and where in the record would we find that? If you read the record, Mr. Hodgey indicated in his deposition that he needed 60 to 90 minutes. It depended on traffic, how long the sermon was that day. So he needed 60 to 90 minutes. And there's not much in the record, but by the time we get to the spring of 2008, the teacher comes in and says that Mr. Hodgey is leaving and he's not coming back. This is Ms. Ellingwood? Yes. She tells the principal that he's leaving and not coming back. Yes, she expresses to the principal because the Court recognized this is an ESL, English as a Second Language class. She's dealing with children that she can't always communicate with, and that's the purpose of Mr. Hodgey being there. He serves a very important role. And on Fridays, he was leaving at noon and he was not returning to his job. Now, that wasn't every day, but it seems like it was happening more and more frequently because the teacher was expressing to the principal, we've got a problem here. So the principal began to have discussion with Mr. Hodgey and say that we need you to come back. We need you to come back before the end of the day, so don't take the rest of the day off. By the time April gets here, both April 4th and April 11th of 2008, Mr. Hodgey leaves at noon and he doesn't return, despite what the principal had discussed with him. The principal is Lewis, and Wright is... Myra Wright is an executive director of personnel for the district. But first, Mr. Lewis has a meeting with Mr. Hodgey on April the 18th, where he and Hodgey meet, and he indicates that he's leaving early, he needs to come back to school when he's done, he needs to sign out, and he needs to sign back in so we can keep track of what's going on. Mr. Hodgey still takes Fridays off and doesn't return, so the meeting escalates to the executive director's level. She comes out, and they have a meeting. And so Ms. Wright explains, you have a collective bargaining agreement that governs the terms and conditions of your employment. We're going to abide by that. Now, the appellant claims that the district's manipulating the rules. Well, that's not accurate. That's not accurate. What happened was they were kind of disregarding the rules, and they were now telling Mr. Hodgey on April the 21st that we need to have some order here. So, you have... about the YouTube video that criticizes apparently teaching Greek classics or Greek mythology. Two points. One, the YouTube video was investigated in February, I believe, and there was an investigation. It was discussed. Mr. Hodgey wasn't disciplined. The YouTube video never came up again, ever, never came up. It wasn't in the investigator's file after that. It didn't concern the principal after that. There's no evidence that the teacher even knew that the YouTube video was out there. Sorry, the teacher, meaning Ellingwood? Yes, I'm sorry. Counsel, if I may, was there... What did Mr. Hodgey say in terms of his testimony regarding his not returning to the school on Fridays? He never really responded, to my knowledge. He just indicated that he needed to go to prayer, and there was no indication as to why he wasn't coming back. Well, let me take that back. He did have some indication in the record that, in addition to conducting the service, he would counsel with other people who were attending the service. So, it was gone beyond his expressed purpose of attending prayer on Friday afternoon, which he had to under his religion, to expanding to this counseling role. In essence, the Columbus Public Schools was paying Mr. Hodgey to conduct his religious services and counsel his followers on Friday afternoons, and that wasn't what... Wasn't that part of his appeal to them? Wasn't his role in the community, and in that community in particular, some of the appeal and what led them to solicit him to apply in the first place? Isn't there testimony in the record that they approved of or found appealing the fact that he was a trusted voice in that community? They knew he was an imam at that time, at the time that they solicited and had that role. Why isn't that, perhaps even indirectly, why isn't that part of his appeal as an employee? It is part of his appeal as an employee. You're exactly right. They sought Mr. Hodgey out because he was a leader in the community, but I think it's a different question as to whether he is permitted to leave work when he's needed at work. He's valuable in that classroom and do more than just engage in prayer, which is what he was asking for, which is what his religion called for. And another thing with this... Excuse me, counsel. Is it the city's position then that he was in violation of the rules and agreement for that entire period of 28 months or 30 months when he was leaving every Friday and taking more than 30 minutes for lunch or more than 30 minutes plus two 15-minute breaks aggregated for an hour, assuming that's permissible? Is the city's position that he was in violation of the rules that entire period of time? In terms of the rules in the collective bargaining agreement, I would say he was not following the rules of the collective bargaining agreement, but the principal permitted him to leave to attend prayer, which is what Mr. Hodgey indicated that his religion required, and he was permitted to leave from 60 to 90 minutes and come back to school after that was over. Was there indication that he was signing in and out in those previous times? No. Okay. Let me ask you about the parking lot incident because you make specific reference to his leaving on April 4th and April 11th, and then the parking lot incident is May 30th. Is there any evidence about the Fridays in between then? I don't know if there's anything in the record. When he left at the end of April, or was it April 30th, I believe? No, May 30th. Okay, May 30th. Parking lot. Yeah, when he was leaving, see, that's the issue. That's the really fundamental issue. He had been told by the principal that he needed to sign in and sign out and he needed to come back to class. He had been told by the executive director. Actually, it's important to understand the executive director came in and she explained to Mr. Hodgey. Okay, but is your answer to my question that there's simply no evidence about what was happening on the intervening Fridays between April 11th, where there is record evidence, and then the May 30 incident? That's correct. I don't know that the record indicates one way or another. Okay. In terms of the conflict between Mr. Hodgey and his responsibilities as an employee, the executive director came to him and they had the meeting, and she explained that we have reasonable accommodations available to you. You have your lunch period. You have two 15-minutes a day. You can somehow combine those if it works out with the teacher, and that's the problem. It wasn't working out with the teacher. You have religious leave. You have three days of paid religious leave. You have two personal days. Those days, she indicated to Mr. Hodgey, you can take in increments. So if you need 90 minutes a day, you can take your time, just submit it the same as everybody else in the district was doing, and you have the time available to leave and attend to your religious responsibilities. So he had time available. And if he didn't have paid time, he could request unpaid leave. And I'm willing to venture that as long as it didn't become a serious problem in the classroom as it had become, he would be granted unpaid leave. With respect to the questions that Judge Kethledge asked about whether his absences became more protracted, is there specific evidence about that, or does it rely? Is it Ellingwood who says he's leaving and not coming back when there was an implication that prior to some period of time, he was leaving and coming back? Yes. I think the record reflects that when he was initially leaving, that's what he was asking for, and presumably that's what he was taking. But I don't think the issue of him never returning started cropping up until the springtime of 2008. And is that based, is there anything other than Ellingwood's statement about leaving and not coming back? Is there anybody else or any other documentation? Not to my knowledge other than the day, May 30. May 30. Correct. So the challenge here is Judge Graham, the district court, I'm sorry, the district court determined that the prima facie case had not been made out, but even if it had, there was legitimate non-discriminatory reasons for the suspension that's an issue and for the termination that is an issue. So we believe the court was justified and correct in finding that there's no dispute of material fact and that the appellant had failed to make his case that either a First Amendment violation had occurred or that a Title VII violation had occurred. One other point I would like to make, because it bothered me when I read it, and that is the reference to jihadists. And I read Mr. Hodge's deposition in detail these last few days because I wasn't the attorney who was originally going to argue this case, and I found nowhere in the record, nowhere, that that was used. So there's nothing in the record where anybody accused Mr. Hodge of being a jihadist. I'm not aware of a page where that word appears. So I think that's an unfair reference, and I think it's indicative of the stretch that the appellant is going to to try to create this issue of fact that the school district had an in for Mr. Hodge and were going to retaliate against him for what he was doing. The second largest Somali population in the country is in Columbus. There are lots of Muslims who are employed by the Columbus City Schools. There are others who have these prayer obligations. Another accommodation they have is they have a room in each building. There was a room at Mifflin Middle School that Mr. Hodge could attend in private and conduct the prayer that he needed to conduct. But I understand he's an imam. He had to be at his mosque, and they were trying to accommodate that. It was only when it got beyond what the original agreement was that they tried to put some parameters on it, and Mr. Hodge. So when you refer to original agreement, you're saying there really was an agreement, which is the argument that the other side is making. Yes, it was in the formal written agreement, but informally the principal said, look, that's fine. I understand you have these religious obligations. As long as you can work it out with the teacher, fine. It's only when it got to be more than what was originally agreed to that the issues started arising. The school district tried to put some order to it and allow Mr. Hodge to continue to have the ability to exercise his religious rights and also the school district get the benefit of his employment and his value in assisting in the classroom. I have nothing further if there are no further questions. Any other questions? Judge Helmick? No, thank you, sir. Thank you. Thank you. Your time for rebuttal. And you might indicate whether you do have a page reference for this jihadi argument. Yes, Your Honor. I'd like to make several points on rebuttal. One is I believe Mr. Hodge has indicated that during the YouTube investigation he was asked whether he was a jihadist. I've marked here page ID numbers 186 and 188. We can look it up. So that's where that jihadist comment comes up. But also, this court has held that a plaintiff's deposition testimony by itself can be sufficient to create a genuine issue of material fact. Here, Haji's testimony is not only believable because it's supported by some circumstantial evidence, but it also conflicts with the school's testimony in significant and material ways. That alone should be sufficient to create a jury question. Conflicts with respect to what? With respect to your adversary has kind of conceded your point that there was some kind of agreement earlier, but does it conflict with respect to, for example, was he not coming back at all during this later period? I think that's correct. Two quick points. This is the first time I believe that the appellees have conceded that there was, in fact, an employment agreement. He's going to lose on that anyway. So second, I think the record reflects that it's unclear when exactly, if there was even a pattern regarding how long he would be leaving even later on during the period. Does he testify at some point that I always came back on Friday afternoon? No. There's testimony that shows that sometimes, depending on the day, he would not come back, but sometimes that he would. Sorry. If you said sometimes he did come back, I just asked you, is there evidence that he did come back? Yes. I'm sorry. Which is based on what? His deposition testimony. And do you have a page for that? I do not have a page. Okay. We can look it up. What time frame are we talking about here? I believe the question was posed with regards to the entire time frame, the entire 28 months. Okay. But then that's not very good evidence that he did come back during the 08, the early 08 period. If the question was asked, you know, well, did you come back? And he said sometimes. Okay. But go ahead. I think that's correct, but I don't believe that there's significant evidence the other way either that he was not coming back. I think a reasonable fact finder could infer that perhaps, you know, that's a disputed issue of fact. And at this stage of the litigation, I would contend that that inference should be made in favor of Mr. Haji since he's the not moving party here. But we do have the undisputed fact that Ms. Ellingwood complains about the absences, you know, right before Lewis raises the issue with your client. That's true. Yes. Excuse me. Excuse me, counsel, if I may. My recollection of the record, correct me if I'm wrong, but while she did discuss with Mr. Lewis, she, Ellingwood, discussed with Mr. Lewis, Mr. Haji's absences during the spring of 2008, my recollection of her testimony is that she denied the label complaining. That is, she said she did not characterize her discussions with him as complaining about his absences. Am I wrong about that? No, you're correct. Those were her words. I think that's page ID 860 to 61 according to my notes. That's correct. And, Your Honors, I see that I'm out of time, so unless there are further questions. Any other questions then? All right. Thank you, counsel. Thank you. We appreciate your arguments on both sides, and we appreciate everybody being healthy to come today. The case will be submitted.